UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RLI INSURANCE COMPANY,

              Plaintiff,

- against -

ATHAN CONTRACTING CORP.;
ATHANASIOS KOUKOULIS, a/k/a TOM
KOUKOULIS; DEMETRIOUS REXINES;
and HARVEY PINCUS, *in his capacity as
Executor of the Estate of Maxine Pincus*,

              Defendants.
------------------------------------------------------------X
ATHAN CONTRACTING CORP. and
ATHANASIOS KOUKOILIS,

              Cross-Claimants,

- against -

DEMETRIOUS REXINES and
HARVEY PINCUS, *in his capacity as
Executor of the Estate of Maxine Pincus*,

              Cross-Defendants.
------------------------------------------------------------X

MEMORANDUM AND ORDER
06-CV-5821 (RRM) (MDG)

MAUSKOPF, United States District Judge.

RLI Insurance Company ("RLI"), an Illinois corporation, commenced this action in October 2006, and currently asserts claims against Athan Contracting Corp. ("Athan"), a New York corporation; Athanasios Koukoulis ("Koukoulis"); Demetrious Rexines ("Rexines"); and Harvey Pincus, in his capacity as Executor of the Estate of Maxine Pincus ("Pincus"). Before the Court are two motions for summary judgment, one filed by RLI and the other by Pincus, pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, both motions are GRANTED.

## BACKGROUND

The following facts are taken from the parties' Statements of Material Facts pursuant to Local Rule 56.1 and the affidavits, deposition transcripts, and exhibits filed therewith, and are either undisputed or set forth in the light most favorable to Athan and Koukoulis. The parties' dispute principally arises out of a contract between Athan, a general contracting company wholly owned by Koukoulis, and RLI, a surety company.

### A. The RLI-Athan Indemnity Agreement

On March 7, 2002, RLI, Athan, and Koukoulis executed an Agreement of Indemnity (the "Indemnity Agreement"). That Agreement begins by acknowledging that Athan "may desire or be required to give or procure certain surety bonds, undertakings, or instruments of guarantee," and that RLI, "upon the express condition that this [Indemnity Agreement] should be given ... may from time to time hereafter execute[,] or procure to be executed, said Bonds on behalf of [Athan]." The indemnification portion of the Agreement reads as follows:

> The Contractor [Athan] and Indemnitors [Koukoulis] jointly and severally shall exonerate, indemnify, and keep indemnified the Surety [RLI] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety [RLI] may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor [Athan] and Indemnitors [Koukoulis] to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.

The Agreement also contains a takeover provision, which reads as follows:

> In the event of any breach or default asserted by the obligee on any [bonds issued by RLI on behalf of Athan] ... the Surety [RLI] shall have the right ... to take possession of any part or all of the work under any contract or contracts or obligations covered by any said Bonds, and at the expense of

2

the Contractor [Athan] and Indemnitors [Koukoulis] to complete or arrange for the completion of the same."

The Agreement was signed by Koukoulis on behalf of both Athan (as "Contractor") and himself (as an "Individual Indemnitor"). In other words, both Athan and Koukoulis agreed to indemnify RLI for any losses resulting from RLI's issuance or procurement of surety bonds on behalf of Athan and/or Koukoulis.

### B. The Project

In September 2005, RLI was asked to issue a bid bond (the "Bid Bond") to insure Athan's bid on a construction project for the New Jersey Department of Military and Veterans Affairs (the "DMAVA") at the Trenton Artillery Armory in Lawrenceville, New Jersey (the "Project"). Athan and Koukoulis maintain that the procurement of the Bid Bond and submission of the bid were the unauthorized acts of Rexines, one of Athan's employees, taken without Koukoulis's knowledge. (*See* Defendants' Amended Response to RLI's Statement of Material Facts Pursuant to Local Rule 56.1 (Doc. No. 53) ("56.1 Resp.") ¶ 3-4.)

The procurement of the Bid Bond was a necessary prerequisite to bidding on the Project, and Athan was required to submit the Bid Bond along with its bid form. According to Koukoulis and Athan, all of the paperwork related to the bid was prepared exclusively by Rexines. Although Koukoulis's name and signature appear on the bid form and Bid Bond, according to Athan and Koukoulis, "Rexines forged Koukoulis'[s] name on the Bid Form ... [and] wrote his initials to the right of Koukoulis['s] forged signature." (*Id.* ¶ 6.) Pincus notarized the signatures on both the Bid Bond and the bid form submitted to the DMAVA as those of Koukoulis.

On September 9, 2005, RLI issued the Bid Bond on behalf of Athan. (*Id.* ¶ 5.) The Bid Bond guaranteed that, in the event that Athan was the winning bidder but failed to complete the Project, RLI would be responsible for the difference between the amount of Athan's winning bid and the amount necessary to pay another contractor to complete the Project.

Athan's was the winning bid for the Project, at $700,000 – more than $300,000 less than the next-lowest bidder. After Athan won the construction rights to the Project, Rexines sent a letter to the DMAVA, requesting that Athan be allowed to withdraw its bid. (*Id.* ¶ 8.) As before, Rexines signed Koukoulis's name on the letter and placed his own initials next to the signature. (*Id.*) The DMAVA rejected that request and insisted that Athan either proceed with the Project or compensate the DMAVA for the difference between its own, winning bid and the amount bid by the next-lowest bidder. (*Id.* ¶ 9.)

RLI, for its part, had concerns regarding Athan's ability to go forward with the contract in light of the significant disparity between Athan's bid and that of the second-lowest bidder. RLI contacted Koukoulis, and on November 1, 2005, Koukoulis participated in a telephone conference with three RLI employees – Denese Thompson, a bond broker, and Rick Albrecht and John Ventura, two underwriters. The parties agree that "Ventura asked Koukoulis whether Athan would be able to complete the Contract," and "Koukoulis advised that Athan could successfully complete the Contract." (*Id.* ¶ 26.)

In addition, during his deposition, Koukoulis testified that he had spoken with Rexines prior to the November 1, 2005 conference call. Koukoulis testified that Rexines informed him of the bid and assured him that he could complete the job. (Bondy Decl. Ex. 35 (Koukoulis Dep., Feb. 14, 2008) at 59:24-61:12.) Koukoulis testified that, after Rexines explained the specifics of the Project to him, Koukoulis "didn't see [a] problem" with the job. (*Id.*) Koukoulis

acknowledged having "told Rexines okay, go ahead you finish the job." (*Id.* at 60:16-17.) Specifically, Koukoulis testified that he told Rexines, "I don't care. You do it. It is your job." (*Id.* at 60:9-10.)

Koukoulis admits that he never told the DMAVA that Rexines was not authorized to bid on the job. (*Id.* at 60:11-12.) He also admits that he never told RLI not to issue the bond or informed them that the bid was unauthorized. (*Id.* at 63:7-11.) Indeed, Athan and Koukoulis acknowledge that "[p]rior to the commencement of this action, neither Athan nor Koukoulis advised RLI that the execution of the Bid Form, Bid Bond, Agreement, or the Bonds were not authorized acts." (56.1 Resp. ¶ 19.)

After the November 1, 2005 conference call, RLI issued a performance bond (the "Performance Bond") and payment bond (the "Payment Bond") (collectively, along with the Bid Bond, the "Bonds") for the Project. The Payment and Performance Bonds were issued on November 15, 2005, and signed in substantially the same manner as the Bid Bond. (*Id.* ¶ 13.) The Performance Bond guaranteed that Athan would perform the Project for $700,000, and the Payment Bond guaranteed that all necessary payments (to subcontractors, laborers, *etc.*) would be made. Pincus notarized Koukoulis's purported signature (evidently placed there by Rexines) on the Payment and Performance Bonds. A separate contract was executed between Athan and the DMAVA – again, according to Athan and Koukoulis, signed on behalf of Koukoulis by Rexines – with Koukoulis's signature notarized by Pincus.

Also following the conference call, Koukoulis sat down with Rexines to discuss the Project. Koukoulis testified that he regularly checked in with Rexines about the status of the Project – "once a week at least." (Koukoulis Dep. at 67:16.) Koukoulis further testified during his deposition that he personally signed numerous checks relating to the Project, including (1) a

5

check for the bond premiums payable to RLI, and (2) a $20,000 check payable to one of the subcontractors. (*Id.* at 141:4-21.)

For reasons that are not fully explained in the parties' summary judgment papers, Athan did not complete the Project. The parties agree that "[b]y letter dated May 17, 2006, DMAVA terminated Athan's contract due to Athan's failure to perform." (56.1 Resp. ¶ 15.) Pursuant to the Bonds issued by RLI, "DMAVA subsequently demanded that RLI arrange for completion of the Contract." (*Id.* ¶ 16.) RLI entered into a "Takeover Agreement" with the DMAVA, agreeing to complete the Project. (*Id.* ¶ 21.) RLI then hired another contractor to finish the work. (*Id.* ¶ 22.) The contract was completed, resulting in a $250,000 loss to RLI. (*Id.* ¶¶ 22-23.)

### C. Procedural history

RLI commenced this action against Athan and Koukoulis in October 2006. RLI filed an amended complaint in June 2007, adding Rexines and Pincus as defendants. In January 2008, together with their answer to the amended complaint, Athan and Koukoulis asserted cross-claims against Rexines and Pincus. Rexines has never appeared in this action, although no party has yet moved for an entry of default against him by the Clerk of the Court.

Now before the Court are two motions for summary judgment. First, RLI moves for summary judgment on its claim against Athan and Koukoulis. RLI asserts three central arguments: (1) Rexines had *apparent authority* to bid on the Project and procure RLI's issuance of the surety Bonds on behalf of Athan; (2) Rexines had *actual authority* to do the same; and (3) in any event, Athan and Koukoulis *ratified* Rexines's actions in pursuing the Project and procuring the Bonds. In addition, Pincus (through her estate's representative) moves for summary judgment on both RLI's claim and Athan and Koukoulis's cross-claim against her.

Pincus echoes RLI's argument concerning ratification and insists that any and all liability rests with Athan and Koukoulis, notwithstanding the possibility that Pincus may have improperly notarized a signature by Rexines as that of Koukoulis.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact would exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, a party moving for summary judgment shall prevail if the nonmovant fails to proffer enough evidence to "create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson*, 477 U.S. at 247-48).

## DISCUSSION

Athan and Koukoulis do not dispute the fact that they would be jointly liable under the Indemnity Agreement for any losses sustained by RLI based on surety bonds issued at the request of Athan. Athan and Koukoulis maintain, however, that Rexines's actions in procuring the Bonds and successfully bidding on the Project were unauthorized and cannot be imputed to the company. RLI, in turn, offers three theories for imputing Rexines's actions to Athan: (1) apparent authority, (2) actual authority, and (3) ratification.

### A. Apparent and actual authority

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is *traceable to the principal's manifestations*." Restatement (Third) of Agency, § 2.03 (emphasis added). Under New York law, "[t]he existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some *misleading conduct on the part of the principal –*

*not the agent." Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 245 (N.Y. 2002) (emphasis added and citation omitted).

Actual authority, on the other hand, exists when, at the time that an agent takes action "that has legal consequences for the principal, the agent reasonably believes, in accordance with *the principal's manifestations to the agent*, that the principal wishes the agent so to act." Restatement (Third) of Agency, § 2.01 (emphasis added). Actual authority "may be express or implied, but in either case it exists only where the agent may reasonably infer *from the words or conduct of the principal* that the principal has consented to the agent's performance of a particular act." *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (emphasis added).

Although Athan and Koukoulis concede that Rexines "was responsible for handling all the paperwork required to operate Athan" and that he "prepared bids, contracts and specifications for subcontractors," see 56.1 Resp. ¶ 25, the Court nevertheless concludes that the record in this case is insufficiently developed to grant summary judgment on a theory that Rexines was acting either with Athan's and Koukoulis's apparent authority or with their actual authority, at least with respect to Rexines's procurement of the Bid Bond and initial submission of the bid to the DMAVA. The Court need not belabor the point, however, as the doctrine of ratification is dispositive of RLI's claims in this case.

**B.     Ratification**

Under New York law, a principal can be held liable for the unauthorized acts of an agent that the principal later ratifies. *See e.g., J.M. Heinike Associates, Inc. v. Chili Lumber Co.*, 443 N.Y.S.2d 512 (4th Dep't 1981). "Ratification is the express or implied adoption, *i.e.,* recognition

and approval, of the unauthorized acts of another." *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89-CV-8376, 1993 U.S. Dist. LEXIS 7071, at *13 (S.D.N.Y. May 26, 1993) (citing *Prisco v. New York*, 804 F. Supp. 518, 523 (S.D.N.Y. 1992)); *Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 232 (4th Dep't 1982); 2 N.Y. Jur.2d Agency, § 155). "[R]atification occurs when a principal, having knowledge of the material facts in a transaction, evidences an intention to affirm or adopt the transaction of his agent through his acts or words." *Id.* (citations omitted). In other words, "[w]here the principal knows of an unauthorized act taken on his behalf and remains silent, he is deemed to have ratified the act." *Velez v. Vassallo*, 203 F. Supp. 2d 312, 322 (S.D.N.Y. 2002).

The undisputed facts in this case are more than sufficient to demonstrate that Koukoulis ratified Rexines's actions. Koukoulis acknowledges having said to Rexines, "[O]kay, go ahead you finish the job," and, "I don't care. You do it. It is your job." Thereafter, Koukoulis discussed the status of the Project with Rexines "at least" once a week. Koukoulis and Athan also concede that on November 1, 2005, Koukoulis, having learned of Rexines's procurement of the Bid Bond from RLI and successful bid on the Project, "advised [RLI] that Athan could successfully complete the Contract." Had Koukoulis and Athan wished to repudiate Rexines's actions, that was the time to do so. Instead, Koukoulis assured RLI that Athan would complete the project and signed a check to RLI for the bond premiums. Those actions constitute ratification of Rexines's conduct. Indeed, Koukoulis and Athan concede that they *never* – prior to the commencement of this action – suggested to RLI that any of Rexines's actions were unauthorized.

Koukoulis and Athan nonetheless argue that Koukoulis did not ratify Rexines's actions because "Koukoulis never acquired full knowledge of the material facts relating to the execution

10

of the Contract and Performance and Payment Bonds." (Defs.' Mem. at 23.) In support of that argument, Koukoulis and Athan rely on the facts that "Koukoulis never saw the Bid Bond Request" and that Rexines forged Koukoulis's signature on that and other documents. Even assuming that Rexines signed Koukoulis's name on the relevant documents and that Koukoulis never saw the "Bid Bond Request" or any of the other paperwork, however, Athan and Koukoulis *did* know the material facts concerning Athan's role in the Project – Koukoulis knew that Rexines procured the Bid Bond from RLI and successfully bid on the Project. That was certainly enough knowledge to render Koukoulis's subsequent actions – which included (1) reassuring RLI that Athan would complete the Project, (2) paying RLI its bond premiums, and (3) delegating primary responsibility for supervising the Project to Rexines – a ratification of Rexines's conduct.

Koukoulis and Athan also argue that ratification did not occur here because Athan never "accepted the benefits" of the contract with the DMAVA. The Court disagrees. First, this Court agrees with the district court in *Orix* that "acceptance of benefits" is simply one means of evincing an intent to affirm or adopt the acts of another, rather than a distinct "element" of a ratification "test." *See Orix*, 1993 U.S. Dist. LEXIS 7071, at *14-22. Even if "acceptance of benefits" were an element of ratification, however, the Court would find that element met here, as Koukoulis's expression of an intent to complete the Project was both an "acceptance of benefits" and part of a course of conduct through which he manifested a clear intention to authorize and adopt Rexines's actions. The DMAVA Project was an opportunity for Athan to earn a profit, not a volunteer effort, and the fact that Athan later decided to abandon the Project does not negate the fact that Koukoulis's expressions of willingness to move forward with the Project constituted an "acceptance of benefits."

11

Athan and Koukoulis's argument that the documents signed by Rexines were "void *ab initio*" is equally irrelevant. The authorities cited in support this argument simply discuss the unremarkable proposition that one whose signature is forged on a contract is not bound by virtue of the forgery. That argument misses the point, however, as Athan and Koukoulis cite no authority for the contention that an unauthorized signature cannot subsequently be *ratified* by the purported signer.[1] Thus, while it is true that the original "forgery" may be "void" standing alone, the question here is whether the subsequent manifestations of assent by Athan and Koukoulis were sufficient to ratify the actions of Rexines. For the reasons just discussed, the Court finds that Athan and Koukoulis's actions were sufficient to constitute ratification. *See Holm*, 89 A.D.2d at 233 (observing that ratification "relates back and supplies original authority").

## C.     RLI is entitled to summary judgment

Because the undisputed facts demonstrate that Athan and Koukoulis ratified Rexines's actions, including his procurement of the Bonds from RLI and his successful bid for the DMAVA project, RLI is entitled to summary judgment on its claims against Athan and Koukoulis. Based on the terms of the Indemnity Agreement, Athan and Koukoulis are jointly and severally liable for the losses and expenses sustained by RLI by reason of Athan's failure to complete the Project. Specifically, RLI is entitled to recover $250,000 – representing the

---

[1] In fact, several of the court decisions cited by Athan and Koukoulis – involving cases where forgery was alleged – explicitly noted in their rulings that the elements of ratification were not present in those cases. *See, e.g., Orlosky v. Empire Sec. Sys.*, 230 A.D.2d 401, 404 (3d Dep't 1997) ("plaintiffs made no payments ... or took any other action which could support an argument that they ratified the forged agreement or created a contract by conduct"). *See also Kwang Hee Lee v. ADJMI 936 Realty Assoc.*, 46 A.D.3d 629, 631 (2d Dep't 2007) ("there is no evidence that [the principal] ratified [the agent's] conduct"); *Crispino v. Greenpoint Mortg. Corp.*, 304 A.D.2d 608, 609 (2d Dep't 2003) (ruling that trial court correctly set aside deed and mortgage obtained under false pretenses when the defendant "concede[d] that the plaintiff's signature on the deed was forged" and there was "no evidence that the plaintiff was aware of the forgery or ratified her [the agent's] actions").

difference between the contract price received from the DMAVA and the amount RLI spent to ensure completion of the Project. (*See* 56.1 Resp. ¶ 23.)

In addition, under the terms of the Indemnity Agreement, RLI is entitled to "interest, court costs and counsel fees." RLI has not demonstrated the amount of interest, courts costs, and attorneys' fees to which it is entitled. The Court addresses that issue below.

### D. The claims against Pincus

In light of the Court's decision with respect to Athan and Koukoulis's ratification of Rexines's actions, both RLI's claim and Athan and Koukoulis's cross-claim against Pincus are no longer viable. While a notary public may be held liable for damages caused by misconduct in the performance of his or her duties, see N.Y Exec. Law § 135, to recover, a plaintiff must demonstrate that the notary's wrongful act proximately caused those damages. *See, e.g., Maloney v. Stone*, 195 A.D.2d 1065, 1068 (4th Dep't 1993); *Kainz v. Goldsmith*, 231 A.D. 171, 172 (1st Dep't 1930). Here, because Koukoulis ratified Rexines's actions, Pincus's notarization of the purported Koukoulis signatures, even if negligent or otherwise wrongful, cannot be said to have proximately caused injury to any party. Accordingly, Pincus's motion for summary judgment is granted in its entirety and all claims against Pincus are dismissed.

### CONCLUSION

For the reasons set forth above, both RLI's and Pincus's motions for summary judgment are GRANTED. The parties are directed to meet and confer in an attempt to resolve the outstanding issues of interest, costs, and attorneys' fees, and shall file a Joint Status Report with

13

the Court on or before October 30, 2009, explaining whether a resolution was achieved and, if not, setting forth the parties' proposal(s) for addressing those issues.

SO ORDERED.

Dated: Brooklyn, New York
      September 29, 2009

_____
ROSLYNN R. MAUSKOPF
United States District Judge